UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JAMES ALLEN GORDON,

                      Petitioner,

        -against-

SUPERINTENDENT MARC L. BRADT, et al.,

                      Respondents.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**

09 CV 4383 (RJD)

DEARIE, District Judge

      James Allen Gordon petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This case begins with a grisly series of attacks on five women in a Queens home in the early morning hours of July 10, 1996. Three of the women were killed. Of those three, two were sexually assaulted. One of the survivors was beaten in the head with a hammer. The other survivor, who was twice choked to unconsciousness, alerted the police after leaping, naked, from a second-floor window and fleeing to the safety of a neighbor's house.

      Gordon was tried and convicted in January 1999. The subsequent proceedings—like the pretrial proceedings and the trial itself—have been tortuous and protracted, in part due to Gordon's own actions. The state appellate process lasted over a decade. Gordon's habeas petition, which asserts claims of unreasonable delay in the appellate process and ineffective assistance of appellate counsel, has been pending in the federal system for an additional four years. For the reasons set forth below, the petition is denied on its merits.

## BACKGROUND

Within hours of the attacks, Gordon fled to Memphis, Tennessee. He was quickly identified as a suspect. On August 20, 1996, he was arrested in Memphis on a New York parole violation warrant related to a previous conviction. At the police station in Memphis, Gordon waived his Miranda rights and confessed to an NYPD detective. In his confession, he claimed that he was provoked because earlier in the night the victims, accompanied by two masked male accomplices, snubbed out a cigarette on his chest and forced him to have sex with several of the female victims at gunpoint. Because Gordon had signed a waiver of extradition as one of the conditions of his parole, he was flown back to New York the next day.

Gordon was the first capital defendant in Queens County following the reinstatement of the death penalty in New York in 1995. He was represented for two years by a team from the Capital Defenders Office. Through counsel, he moved to suppress his statements to the police, some of the physical evidence, and the eyewitness identifications. The trial court denied the motions. People v. Gordon, 176 Misc. 2d 46, 56 (N.Y. Sup. Ct. 1998). In April 1998, just as the case was ready for trial, the trial court granted Gordon's application to appoint new counsel. Two private attorneys, Christopher Renfroe and Russell Morea, were appointed and the trial was adjourned for five months to allow them time to prepare. On the eve of jury selection, Gordon moved to proceed pro se. The court reluctantly granted the motion, but appointed Refroe and Morea to serve as advisors and to support Gordon as necessary during trial. People v. Gordon, 179 Misc. 2d 940, 941-45 (N.Y. Sup. Ct. Jan. 29, 1999).

The evidence introduced against Gordon was diverse and voluminous. The two surviving victims identified Gordon as their attacker. This identification was particularly probative because the victims had known him for several months before the attacks—a fact to which

Gordon himself alluded as he cross-examined one of the victims. Gordon's confession was read aloud to the jury, although he later took the stand and testified that it was fabricated by the police. Gordon's cousin testified that Gordon had told him several weeks prior to the crimes that he planned to rob the women. A bag of bloody clothes was found in Gordon's backyard. One of Gordon's neighbors identified a hammer that was used as weapon during the attacks and testified that he had loaned the hammer to Gordon earlier in the evening. Finally, semen recovered from one of the dead women matched Gordon's DNA profile. In response, Gordon's then-girlfriend (his wife at the time of the trial) took the stand and testified that Gordon had called her twice from his home during the early morning hours of July 10. Whether or not the jury credited this testimony, it did not establish a strong alibi because Gordon lived across the street from the scene of the crime.

Gordon was convicted of seven counts of first degree murder, two counts of attempted murder in the first degree, rape in the first degree, sodomy in the first degree, and attempted sexual abuse in the first degree. The first degree murder counts were death eligible. At the sentencing phase, the jury unanimously sentenced Gordon to life without parole on three of the death-eligible counts. The jury deadlocked on the appropriate sentence for the four remaining death-eligible counts. The judge then sentenced Gordon to consecutive indeterminate sentences of twenty-five years to life on each of the deadlocked counts, as set forth in C.P.L. § 400.27[10].

In March 1999, the Appellate Division appointed Appellate Advocates to represent Gordon. The 8,000 page record became available in January 2000. Given the weight of evidence against Gordon, the Appellate Advocates lawyer was concerned that a successful appeal would lead to retrial and that, at the conclusion of trial, Gordon might again face the death penalty on the four deadlocked counts. Although it was an open question in New York whether

a capital defendant was death eligible at resentencing for counts on which the jury had previously deadlocked, the Supreme Court of Pennsylvania had twice ruled that capital defendants could face the death penalty for a second time under similar circumstances. See Commonwealth v. Sattazahn, 563 Pa. 533, 545-51 (2000); Commonwealth v. Martoramo, 535 Pa. 178, 190-200 (1993). Accordingly, before honing the issues that he planned to present on appeal, the Appellate Advocates lawyer asked Gordon to provide a notarized statement indicating that he understood the risks of proceeding.

Correspondence ensued. In a series of letters, the lawyer insisted upon the notarized acceptance of risk. Gordon refused. Instead, he insisted on a full description of the issues that Appellate Advocates intended to advance on his behalf. The Appellate Advocates lawyer explained that he could not provide a full issues list without spending a significant amount of time reviewing the voluminous record and would not undertake that task if Gordon did not intend to proceed.

The matter came to a head in December 2000 when the Appellate Advocates lawyer informed Gordon that he would file an abandonment motion if Gordon failed to provide the notarized acceptance of risk by late January 2001. Gordon acted first. In early January, he moved to relieve Appellate Advocates. The Appellate Division denied Gordon's motion in February. In mid-March, the Appellate Advocates lawyer informed Gordon that he would file an abandonment motion if Gordon did not provide the authorization by April 10. Gordon did not respond. In mid-April, Appellate Advocates moved to abandon. After several rounds of briefing, in October 2001 the Appellate Division removed Appellate Advocates and appointed Legal Aid to pursue Gordon's appeal.

4

The record does not indicate what, if anything, occurred over the course of the next four-and-a-half years. In June 2004, however, in an unrelated case, the New York Court of Appeals found New York's death penalty statute unconstitutional. See People v. Lavalle, 3 N.Y.3d 88, 116-32 (2004). The rationale that Appellate Advocate had advanced for not proceeding with the appeal absent authorization was mooted.

Two years later, in May 2006, Legal Aid filed a brief in the Appellate Division on Gordon's behalf. The brief made three arguments: (1) the trial court's decision to allow Gordon to represent himself was inappropriate; (2) the trial court erroneously denied the application, made by Gordon's counsel, for a competency examination; and (3) the trial court improperly declined to charge the jury with the affirmative defense of extreme emotional disturbance, as Gordon's legal advisors had requested at the end of trial. Gordon contends that he did not become aware of Legal Aid's appellate brief until nearly one year later, in April 2007, when the state served him with its response.

Shortly thereafter, Gordon sought permission from the Appellate Division to file a supplemental brief. His Legal Aid attorney filed a motion in support, explaining that he had raised all viable issues, but that he believed a supplemental brief was appropriate given that Gordon was serving a life sentence without parole. The motion was denied. Gordon again moved to file a supplemental brief, explaining that his attorneys had not informed him that they had filed a brief on his behalf. This time, the Appellate Division granted the motion and permitted Gordon to file a supplemental brief.

Gordon, however, did not file the supplemental brief. Instead, he sought a series of extensions of time to respond. The Appellate Division granted five extensions totaling nearly two years. The final extension set a deadline of June 9, 2009. Gordon missed the deadline.

5

Three days later, on June 12, Gordon filed a sixth request for an extension. The Appellate Division denied the motion and vacated its earlier decision granting him permission to file a supplemental brief. Gordon nonetheless filed papers opposing the Legal Aid brief in late August. Oral argument was held on September 14, 2009.

On October 2, 2009, after oral argument but before the Appellate Division issued its ruling, Gordon filed this habeas petition in federal court, seeking relief based on (1) appellate delay and (2) ineffective assistance of appellate counsel. The Appellate Division denied Gordon's direct appeal several weeks later, on October 20. People v. Gordon, 66 A.D.3d 920, 921 (2d Dep't 2009). In its decision, the Appellate Division did not mention Gordon's brief or discuss any of the arguments raised therein. Id. The Court of Appeals denied leave to appeal on December 30, 2009. People v. Gordon, 13 N.Y.3d 907 (2009).

In February 2010, the state moved to dismiss Gordon's federal habeas petition on the grounds that his claims had not properly been exhausted. Gordon filed his traverse in March 2010. He also moved to expand the record and sought a default judgment on the basis that the state's response was untimely. This Court denied Gordon's motions in March 2011. See ECF Nos. 14, 17.

In March 2012, Gordon sought a writ of mandamus from the Second Circuit directing this Court to rule on his habeas petition. The Second Circuit denied Gordon's request for a writ of mandamus and issued the mandate on August 23, 2012. See ECF No. 21. On September 21, 2012, this Court held that Gordon had failed to exhaust his claims for habeas relief, but noted that Second Circuit precedent suggested that the appellate delay claim did not require exhaustion. Based on Rhines v. Weber, 544 U.S. 269 (2005), and invoking concerns of comity and federalism, the Court gave Gordon two options: either (1) drop his ineffective assistance of

appellate counsel claim and proceed solely on the appellate delay ground, or (2) exhaust the ineffective assistance of appellate counsel claim by way of a coram nobis petition in the state courts, during which time the habeas petition would be stayed. Sept. 21, 2012 Mem. at 8-9, ECF No. 22.

Gordon chose neither. Instead, he asked this Court to reconsider its September 21, 2012 decision. Out of an abundance of caution, this Court certified the issue for appeal to the Second Circuit on November 21, 2012 and stayed the case. See Nov. 21, 2012 Mem., ECF No. 25. Gordon had ten days to bring his appeal. See 28 U.S.C. § 1292(b). Several days after the expiration of that deadline, on December 7, 2012, he filed a "Request For Extension Of Time" in the Second Circuit. The first five pages of that motion set forth the extensive procedural background of the case. The motion did not reference the certificate of appealability issued by this Court until page six.

Given the nature of the papers, the court clerk apparently—and understandably—did not discern that Gordon's "Request For Extension Of Time" related to a new and separate appeal rather than his previous petition for mandamus. Because the mandate back to this Court had already been issued in Gordon's first appeal, the clerk issued a notice of non-jurisdiction and returned Gordon's papers unfiled. On January 9, 2013, Gordon filed a motion to reconsider in the Second Circuit. Once again the court clerk treated Gordon's motion as related to his previous mandamus petition, rather than a new and separate appeal, and issued a second notice of non-jurisdiction. This Court was unaware of the activity in the Second Circuit until October 11, 2013, when Gordon inquired, by letter, whether this Court had reached a final decision on his petition. See ECF No. 26. Gordon again inquired about the status of the case in a letter dated January 19, 2014. See ECF No. 27.

Given the time that has passed without any progress on Gordon's petition, and mindful that one of grounds for that petition is delay, the Court will not prolong these proceedings by re-issuing a certificate of appealability or reinstating its September 21, 2012 order. In September 2012, the Court invoked "concerns of comity and federalism" to justify providing Gordon with the opportunity to exhaust his ineffective assistance of appellate counsel claim in state court. Those concerns are now outweighed by the interest of finality. The Court accordingly rules on— and denies—Gordon's petition.

## ANALYSIS

### A. Exhaustion

Habeas petitioners generally must exhaust their claims in state court prior to seeking federal relief. 28 U.S.C. § 2254(b). Gordon has not done so. He did not raise his appellate delay claim with the state courts in any form. While he expressed his disagreement with both his Appellate Advocates and Legal Aid attorneys in several filings in the Appellate Division, these filings were not sufficient to exhaust his ineffective assistance of appellate counsel claim. That is because in New York "the coram nobis petition is the only way to exhaust this type of claim for habeas purposes." Daley v. Lee, No. 10-cv-6065, 2012 WL 2577472, at *7 (E.D.N.Y. July 3, 2012) (Garaufis, J.). These failures would typically require dismissal of Gordon's habeas petition.

However, as the Court explained in its September 21, 2012 decision, "a failure to exhaust may be excused . . . where there has been 'substantial delay in the state criminal appeal process.'" Roberites v. Colly, No. 12-4228, 2013 WL 5663231, at *1 (2d Cir. Oct. 18, 2013) (quoting Cody v. Henderson, 936 F.2d 715, 718 (2d Cir. 1991)); see also Williams v. Hoke, No. 92-cv-2650, 1993 WL 37300, at *2 (E.D.N.Y. Feb. 5, 1993) (Sifton, J.), aff'd, 999 F.2d 537 (2d

Cir. 1993) ("the usual requirement of exhaustion of state remedies is relaxed when the habeas petitioner claims an unconstitutional delay in the appellate process"). The fact that the Appellate Division and the Court of Appeals resolved Gordon's appeal during the pendency of the habeas petition does not moot his appellate delay claim. See Vasquez v. Bennett, No. 00-cv-3070, 2002 WL 619282, at *2 (S.D.N.Y. Apr. 17, 2002) (Hellerstein, J.). As the Court explained in September 2012, given the relaxation of the exhaustion requirement for claims of appellate delay, this petition is more properly treated as a mixed petition presenting both an exhausted claim (appellate delay) and an unexhausted claim (ineffective assistance of appellate counsel). See Sept. 21, 2013 Mem. at 3.

Courts presented with mixed petitions have three options. They may (1) dismiss the petition as unexhausted, (2) deny the petition on its merits, or (3) stay the petition and allow the petitioner to return to state court to exhaust his claims. Rhines, 544 U.S. at 273-78; Schouenborg v. Superintendent, Auburn Corr. Facility, No. 08-cv-2865, 2013 WL 5502832, at *5 (E.D.N.Y. Sept. 30, 2013) (Seybert, J.). In order to warrant the stay and abeyance procedure, the petitioner must show that his unexhausted claim is not "plainly meritless" and that his failure to exhaust was justified by "good cause."[1] Sept. 21, 2013 Mem. at 3; see also Rhines, 544 U.S. at 277-78.

In September 2012, the Court concluded that the stay and abeyance procedure was appropriate under the circumstances. Sept. 21, 2013 Mem. at 3-6. The Court did not review Gordon's unexhausted ineffective assistance claim in depth, but rather noted that "its dimensions are considerable." Id. at 4. Without specifically analyzing whether Gordon's claim was "plainly

---

[1] "[I]t likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than dismiss, the mixed petition." Rhines, 544 U.S. at 278.

9

meritless," the Court explained that, because this case is of "obvious importance to the State of New York, concerns of comity and federalism carry great weight and indeed are dispositive." Id. at 6.

More than a year later, however, those concerns of comity and federalism are outweighed by the shared interest of the petitioner and the federal courts "in finality and speedy resolution of federal petitions." Rhines, 544 U.S. at 278. Gordon's letters of October 11, 2013 and January 19, 2014, in which he inquires whether this Court has reached a final decision on his petition, underscore this point. Moreover, having more closely reviewed Gordon's claims, the Court is persuaded that they lack merit. Accordingly, the Court now denies Gordon's petition on its merits. See 28 U.S.C. § 2254(b)(2).

B. Appellate Delay

With respect to Gordon's appellate delay claim, substantial delays can, under certain circumstances, violate due process. See Richard-Antonio v. O'Meara, No. 12-cv-5174, 2013 WL 5019395, at *5 (S.D.N.Y. May 21, 2013) (Netburn, Mag. J.) (citing Cody, 936 F.2d at 718-19). In order to determine whether a delay violates due process, courts assess the four criteria articulated by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 530 (1972): the length of the delay, the reason for the delay and the party responsible, whether the petitioner asserted his right to a decision, and any ensuing prejudice. Elcock v. Henderson, 947 F.2d 1004, 1007 (2d Cir. 1991) ("Elcock I"); see also Roberites, 2013 WL 5663231, at *3.

Nearly eleven years elapsed between Gordon's notice of appeal in February 1999 and the final resolution of his case by the Court of Appeals in December 2009. This was certainly an unusual and significant amount of time. Several courts have held that appellate delays of this duration violated due process. See Elcock I, 947 F.2d at 1007 (citing cases); Brown v. Castello,

No. 00-cv-6421, 2004 WL 1837356, at *2-4 (S.D.N.Y. Aug. 17, 2004) (Casey, J.) (citing cases). In this case, however, much of the delay stemmed from Gordon's own actions, including his admitted refusal to provide Appellate Advocates with the notarized acceptance of risk that they requested and the two years of extensions that he sought (and received) from the Appellate Division in connection with his proposed supplemental brief.

Ultimately, the Court need not decide whether the prolonged appellate proceedings amounted to a violation of due process. The typical remedy for an appellate delay claim, as the Court noted in September 2012, is a conditional writ directing the state appellate courts to resolve the appeal within a defined period of time. Sept. 21, 2012 Mem. at 6 n.4; see also Roberites, 2013 WL 5663231, at *2-3. In this case, because the state courts have already affirmed Gordon's conviction, "the remedy of a conditional writ would serve no purpose." Vasquez v. Reynolds, 58 F. App'x 533, 535 (2d Cir. Mar. 7, 2003).

The termination of a petitioner's state court appeal does not moot his habeas claim for appellate delay. Simmons v. Reynolds, 898 F.2d 865, 867 (2d Cir. 1990). Before the petitioner can obtain "additional habeas relief beyond the grant of a conditional writ," however, he must show "actual prejudice to [his] appeal."[2] Vasquez, 58 F. App'x at 534. In other words, in order to prevail, Gordon must show that his "appeal would have had a different result absent the delay." Diaz v. Henderson, 905 F.2d 652, 653 (2d Cir. 1990); see also Elcock v. Henderson, 28 F.3d 276, 279 (2d Cir. 1994); Richard-Antonio, 2013 WL 5019395, at *9.

---

[2] The fact that a petitioner has suffered "prejudice" for purposes of the Barker due process analysis does not mean that he meets the "actual prejudice to the appeal" standard required for relief beyond a conditional writ. See, e.g., Elcock I, 947 F.2d at 1008 (petitioner was prejudiced by the "unnecessary anxiety and concern" caused by an eight-year appellate delay, but the delay did not have "a detrimental effect on the outcome" of the appeal and thus did not warrant release or a new appeal).

11

There is nothing in the record or the pleadings, however, that suggests that the result of Gordon's appeal would have been different if his appeal had been resolved promptly. Gordon does not allege "that the delay limited his counsel's ability to advance an argument that might allow [him] to prevail on appeal, [or] that the delay denied [him] effective assistance of appellate counsel by giving rise to a conflict of interest[.]" Brown, 2004 WL 1837356, at *4 (citing Cody, 936 F.2d at 719-20 and Elcock I, 947 F.2d at 1009-11). Nor does he allege that he would suffer the "inherent impairment of a defense upon retrial caused by the passage of time, namely the loss of memory by the witnesses and the staling of evidence." Richard-Antonio, 2013 WL 5019395, at *9 (citing Barker, 407 U.S. at 532). Indeed, given the nature of the eyewitness testimony and physical evidence introduced against Gordon at trial, any "loss of memory" or deterioration of evidence would more likely strengthen, rather than impair, Gordon's defense if the case was retried. Because Gordon has not suffered actual prejudice to his appeal, he is not entitled to habeas relief.

C. Ineffective Assistance of Appellate Counsel

The Court now addresses Gordon's ineffective assistance of appellate counsel claim. This claim is not neatly or precisely alleged, but because Gordon is pro se, the Court construes his petition generously. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006). Gordon's ineffective assistance claims can be distilled into three categories. He asserts that his appellate lawyers were ineffective because they (1) ignored potentially meritorious arguments, (2) prejudiced his appeal by making statements and arguments to the appellate courts that suggested that he was guilty, and (3) failed to appropriately communicate with him and delayed the appellate process.

"[T]he Sixth Amendment standard for ineffective assistance of counsel dictates deference to the strategic decisions of . . . appellate counsel, unless [the petitioner] can show that (1) counsel's performance was objectively deficient, and (2) that he was prejudiced by that deficient performance." Blalock v. Fisher, 480 F. App'x 39, 40-41 (2d Cir. 2012) (citing Strickland v. Washington, 466 U.S. 668, 688 (1984)). "With respect to the deficiency prong, we indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 41 (internal quotations omitted). "Further, we will identify prejudice only if [the petitioner] establishes that, but for his appellate counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." Id. (internal quotations and punctuation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the result." Strickland, 466 U.S. at 694. In other words, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691.

The Court begins with Gordon's contention that his appellate counsel failed to assert meritorious arguments.[3] "[A]ppellate counsel who file[] a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. 259, 288 (2000). This doctrine is premised, in part, on the truism that "legal contentions, like the currency, depreciate through over use." Jones v. Barnes, 463 U.S. 745, 751-52 (1983) (quoting Jackson, Advocacy Before the Supreme Court, 25 Temple L.Q. 115, 119 (1951)). In order to succeed on an ineffective

---

[3] "[I]neffective assistance of counsel in violation of the Sixth Amendment is not limited to failures to raise meritorious federal claims. Failure to raise a valid state law claim on appeal may also constitute ineffective assistance, so long as the relevant standards under Strickland are met." Mosby v. Senkowski, 470 F.3d 515, 521 (2d Cir. 2006) (citing Claudio v. Scully, 982 F.2d 798, 803 n.5 (2d Cir. 1992)).

13

assistance of appellate counsel claim, the petitioner must therefore show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Gordon advances a plethora of omitted arguments, none of which are significant, obvious, or stronger than the arguments that Legal Aid raised on his behalf. Several of these arguments involve his arrest and confession in Tennesee and his extradition back to New York. Gordon posits that appellate counsel should have argued that the arrest and extradition were improper because the New York parole violation warrant was pretextual, because the New York warrant was invalid in Tennessee, and because Tennessee law required that Gordon appear before a Tennessee magistrate prior to extradition. Even if these contentions were accurate, they would neither require New York courts to divest themselves of jurisdiction over Gordon nor justify the suppression of the statement that he gave in Memphis. See People v. Sampson, 73 N.Y.2d 908, 909-10 (1989) (refusing to suppress statement by defendant arrested in Vermont by New York police in violation of Vermont law); People v. Walls, 35 N.Y.2d 419, 424 (1974) (arrest in New Jersey and transfer to New York, in violation of New Jersey law, did not deprive New York courts of jurisdiction over the defendant)[4]; People v. Clarke, 5 A.D.3d. 807, 810 (3d Dep't 2004) (failure to challenge purportedly pretextual parole violation warrant did not amount to ineffective assistance of counsel).

Moreover, given the weight of evidence against Gordon, including the eyewitness identifications and the DNA match, even if his confession had been excluded, its admission was

---

[4] In New York, egregious police misconduct might, under certain circumstances, deprive state courts of jurisdiction. Walls, 35 N.Y.2d at 424. The conduct alleged here does not come close to that level. See id.; cf. United States v. Umeh, 762 F. Supp. 2d 658, 661-64 (S.D.N.Y. 2011) (Rakoff, J.) (questioning whether government misconduct, no matter how depraved, could ever require divestiture of jurisdiction over a defendant).

almost certainly harmless error. See People v. Lopez, 16 N.Y.3d 375, 386-88 (2011) (admission of statement obtained in violation of defendant's right to counsel was harmless error); see also U.S. v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006) ("the strength of the government's case is probably the single most critical factor" in the harmless error analysis). This point is fatal to both Strickland prongs. Because the Appellate Division would probably have concluded that the admission of the confession was harmless error, counsel's decision not to challenge the confession on appeal was well within the bounds of reasonable representation. In any case, given the strength of the remaining evidence, Gordon cannot show that he was prejudiced by his appellate counsel's failure to challenge the confession.

Gordon also claims that his appellate counsel failed to raise several arguments related to the multiple counts with which he was charged. According to Gordon, the counts were both mulitiplicitous (that is, there were multiple counts for the same offense) and duplicitous (that is, certain counts charged more than one offense). See People v. Alonzo, 16 N.Y.3d 267, 269 (2011). These arguments have been rejected in a similar context. See People v. Lebron, 305 A.D.2d 799, 800-01 (3d Dep't 2003) (multiple first-degree murder convictions for each murder were neither duplicitous nor multiplicitous). In addition, Gordon claims that his appellate counsel failed to argue that Gordon had been prejudiced by the dismissal, on the prosecution's motion, of fifteen counts immediately prior to trial. This argument is also meritless.

Finally, Gordon posits that his appellate counsel should have argued that he was deprived of effective assistance at the pre-trial stage by the Capital Defenders Office and by Renfroe and Morea. In New York, defendants have a right to testify before the grand jury prior to indictment. C.P.L § 190.50(5). Gordon argues that his appellate counsel should have brought an ineffective assistance claim based on the fact that his Capital Defenders Office lawyer "violated [his] right

15

to testify before the grand jury[.]" Pet. at 53. Gordon does not describe the circumstances surrounding his non-appearance before the grand jury, and they are not readily discernable from the record before the Court. Nonetheless, even assuming that his lawyer somehow acted inappropriately, "the failure of defense counsel to facilitate [the] defendant's testimony before the grand jury does not, per se, amount to the denial of effective assistance of counsel." People v. Simmons, 10 N.Y.3d 946, 948-49 (2008); see also People v. Wiggins, 89 N.Y.2d 872, 873-74 (1996). Here, there is no plausible argument that the evidence at trial was insufficient to sustain the conviction or that Gordon's failure to testify before the grand jury prejudiced him in any way. Indeed, it is hard to imagine that Gordon would have gained any benefit from testifying.

Gordon also contends that Legal Aid should have argued that he was prejudiced when a member of his second team of legal advisors, Renfroe, "went on the record, despite counsel's motion request [to allow Gordon to assist Renfroe and Morea at trial], that [sic] hybrid representation would place trial counsel in violation of the ethics code." Pet. at 53. Gordon seems to imply that Renfroe was suggesting to the trial judge that Gordon had confessed to him or to an attorney from the Capital Defenders Office. See id. at 53-54. Despite having reviewed the transcript of Gordon's application to represent himself pro se and of his waiver of counsel, the Court is unable to find the episode to which Gordon refers. Gordon acknowledges, however, that Renfroe never precisely explained what he meant. Id. And he does not allege that Renfroe's comment was made in the presence of the jury or explain why it prejudiced him or cast any doubt on his conviction. Gordon therefore cannot make out an ineffective assistance of trial counsel claim on that ground, much less an ineffective assistance of appellate counsel claim based on Legal Aid's decision not to raise the issue on appeal.

16

In sum, none of the arguments that Gordon believes that his appellate counsel should have raised is obvious or "clearly and significantly" stronger than the arguments that appellate counsel did raise. Gordon can neither demonstrate that Legal Aid's decision to omit those arguments from its appellate brief was objectively deficient nor show that he suffered any prejudice from their omission.

The Court now addresses Gordon's contention that his appellate attorneys violated his right to effective counsel by disparaging him in the Appellate Division. Gordon takes issue with Appellate Advocates' April 2001 abandonment motion, arguing that the characterization of the evidence against him "present[ed] information of the case that insinuated overwhelming guilt." Pet. at 9. Having reviewed the motion and the trial transcript, the Court is satisfied that the motion fairly characterizes the evidence introduced against Gordon.

Gordon also takes issue with Legal Aid's May 2006 brief to the Appellate Division. In particular, he claims that his alibi defense and claim of innocence were contradicted by Legal Aid's argument that the trial court should have charged the jury with the mitigating defense of extreme emotional disturbance. Pet. at 17-18. While the Legal Aid brief states that the victims "readily" identified Gordon at trial, it does not affirmatively state that Gordon committed the murders. An attorney's decision to advance a legal argument that is inconsistent with actual innocence "in no way suggests that counsel believed that [the defendant] was a participant in the charged crimes, but rather represents counsel's attempt to raise every alternative argument on her client's behalf." Moore v. Scully, 956 F. Supp. 1139, 1151-52 (S.D.N.Y. 1997) (Edelstein, J.). And while Gordon may have preferred that his appellate counsel argue his innocence, "[d]ecisions concerning which legal issues will be urged on appeal are uniquely within the lawyer's skill and competence, and their resolution is ultimately left to his [or her] judgment."

17

Avent v. Napoli, No. 08-cv-932, 2013 WL 1788626, at *17 (S.D.N.Y. Feb. 7, 2013) (Smith, Mag. J.) (quoting Ennis v. LeFevre, 560 F.2d 1072, 1075 (2d Cir. 1977)). The Legal Aid lawyer's decision to focus on other issues was more than reasonable. Gordon's claim that his attorneys improperly disparaged him before the Appellate Division is thus meritless.

Finally, the Court turns to Gordon's claim that his attorneys delayed his appeal and failed to properly communicate with him. Gordon contends that Appellate Advocates' interpretation of New York's death penalty statute was clearly erroneous and resulted in a nearly two-year delay until Appellate Advocates were removed from the case. The Appellate Advocates stance, however, was not unreasonable and their caution falls well within the range of reasonable professional judgment. Indeed, it was almost certainly the prudent course of action. The record reflects that the Appellate Advocates lawyer informed Gordon of his concerns and advised him as to the importance of the notarized acceptance of risk. The delay that ensued resulted from Gordon's refusal to provide that acceptance of risk, not from any deficient conduct by Appellate Advocates.

With regard to the Legal Aid attorneys, Gordon contends that they did not make any filings on his behalf until nearly five years after their appointment and that, when they finally did prepare the appellate brief, they neither consulted with him as to the arguments it contained nor informed him of its filing. Some of that delay, running from Legal Aid's appointment in October 2001 to the June 2004 Court of Appeals decision in Lavalle, might be attributable to a reluctance to proceed based on the same death penalty concerns identified by Appellate Advocates. Some of the delay is almost certainly attributable to counsel's need to digest the voluminous record. And the failure to consult with a client on appellate briefing does not, without more, amount to ineffective assistance of counsel. See Williams v. Comm'r, N.Y. State Dep't of Corr., No. 07-

cv-5496, 2011 WL 5301766, at *21 (S.D.N.Y. Oct. 31, 2011) (Maas, Mag. J.) (citing cases). Nonetheless, the record does not contradict Gordon's assertions or contain any explanation for the alleged inactivity and absence of communication.[5] Assuming that Gordon's representations are true, the lack of communication and the extent of the delay are somewhat troubling. If there was any indication that Gordon was prejudiced by either, the Court would require a more fulsome record to properly evaluate his claim. But given Legal Aid's competent appellate briefing and the heft of the evidence introduced against Gordon at trial, the delay and alleged lack of communication do not undermine confidence in the appeal or the conviction. Because Gordon cannot show that he was prejudiced, as Strickland requires, he cannot prevail on his ineffective assistance of appellate counsel claim.

## CONCLUSION

For the reasons stated above, Gordon's habeas petition is DENIED. Because Gordon has not made a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue. See 28 U.S.C. § 2253(c).

SO ORDERED.

Dated: Brooklyn, New York
       March 25, 2014

/s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge

---

[5] The record does contain a letter dated July 27, 2009, in which a Legal Aid attorney informs Gordon that he "sent you a timely copy of our brief, but for some reason, you did not receive it." ECF No. 1-6, at 48.